IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HONEY BROOK ESTATES | : | CIVIL ACTION |
| | : | NO.  09-6190 |
| v. | : | |
| | : | |
| HONEY BROOK TOWNSHIP, et al. | : | |

O'NEILL, J.                                                    JUNE 7, 2012

## MEMORANDUM

Honey Brook Estates attempted to develop its property for residential use but its land development applications were denied.  HBE now brings suit against Honey Brook Township, the Township's Board of Supervisors and Planning Commission and various municipal officials, alleging the violation of its rights to substantive due process and equal protection under federal law.  HBE also asserts a civil conspiracy claim based on Pennsylvania law.  Defendants now move for summary judgment.  For the reasons that follow, I will grant defendants' motion with respect to HBE's federal claims and decline to exercise supplemental jurisdiction over HBE's remaining state-law conspiracy claim.

## BACKGROUND

I.      Township Considers Comprehensive Plan Update

This dispute centers around a property that plaintiff purchased at auction in December 2005.  Pl.'s Ex. A at 116:22-122:20.  Well before HBE acquired the property, however, the Township began a process that would ultimately result in a new zoning ordinance and affect HBE's ability to develop its land.  At a meeting of the Township's Board of Supervisors on January 6, 2003, the Board first raised the desire to update the Township's comprehensive plan. Dkt. No. 47-4 at 7.  Later that year, the Planning Commission, which makes recommendations to

the Board of Supervisors, discussed the comprehensive plan update at its meetings.  Id. at 9-12.

By the spring of 2004, the Planning Commission was considering whether the comprehensive

plan should be written "in house to save money" but it decided that "the undertaking was too

complex, too extensive and too time consuming for the available staff."  Id. at 26.  The Planning

Commission decided to move forward with interviews of three organizations that had submitted

comprehensive plan proposals.  Id.  The Board of Supervisors selected the proposal of the

Brandywine Conservancy on September 8, 2004.  Id. at 33.  Brandywine charged in excess of

$49,000 for its proposal.  Id.

    The following month, the Board of Supervisors discussed the composition of a task force

to manage the comprehensive plan update.  Id. at 38.  The Board decided that the project was too

large for the Planning Commission to handle on its own and invited several individuals,

including a former Supervisor and former Planning Commission chairs, to join the task force.  Id.

On December 17, 2004, the task force proposed an eighteen-month project schedule for the

comprehensive plan update that was to begin in January 2005 and culminate with the adoption of

the updated comprehensive plan in June 2006.  Id. at 41-44.

    In a May 17, 2005 memorandum to the task force, Brandywine wrote, "[w]e understand

that the Township wants to provide for as little future growth as legally possible, in order to

maintain Honey Brook's rural character and agricultural viability."  Id. at 48.  The memo

included analyses of the Township's development potential, "fair share" obligation[1] and

---

[1]    The "fair share" principle "requires local political units to plan for and provide
land-use regulations which meet the legitimate needs of all categories of people who may desire
to live within its boundaries."  Surrick v. Zoning Hearing Bd. of Upper Providence Twp., 382
A.2d 105, 108 (Pa. 1977).

2

population projections.  Id. at 48-52.  At a joint meeting the following month between the Board

of Supervisors and the task force, the group decided that "[t]he Township [was] easily satisfying

its fair share requirement."  Id. at 57.  The group also agreed that the goals of the comprehensive

plan update included "maintain[ing] the Township's historic resources and rural character" and

"confin[ing] development to designated areas with appropriate infrastructure and largely

composed of non-prime farmland soils."  Id. at 59.

In an October 25, 2005 confidential memorandum to Honey Brook Township Manager

Mike Brown, John Theilacker of Brandywine recommended a litany of changes to the

Township's zoning map.  See id. at 63-65.  Theilacker advised "that the decision to proceed with

zoning changes be kept fairly quiet at least until the formal public notice of the zoning

amendments is released, lest you find a last-minute rush of land development applications."  Id.

at 63.  Theilacker's recommendations included rezoning certain areas to avoid "more intense

development in the future."  Id. at 64.

Similarly, on December 16, 2005, Theilacker wrote Brown a memorandum

recommending certain zoning ordinance amendments that he deemed "critical" because

"important farmlands [were] at risk to indiscriminate land use actions that would result in their

permanent loss."  Id. at 75.  Theilacker explained that "the Township's zoning accommodates

much more development than necessary to comply with the Commonwealth's planning laws."

Id. at 76.  Accordingly, he recommended "shrinking the more intensive zoning districts in size."

Id.  Theilacker further recommended preparing zoning ordinance amendments right away "for

immediate enactment following [Comprehensive] Plan adoption."  Id. at 75.

II.     The Property at 3561 Horseshoe Pike

Also on December 16, 2005, Honey Brook Estates purchased at public auction a forty-three-acre property at 3561 Horseshoe Pike in Honey Brook Township for $1.085 million.  See id. at 79 & Pl.'s Ex. A at 122:20.  Before the auction took place, however, others also showed interest in the property.  Gary McEwen, a land developer in Honey Brook Township, states in a declaration that he contacted Township Manager Brown prior to the auction "to learn more about the property."  Pl.'s Ex. J at 2.  According to McEwen, Brown told him "that the Township was interested in purchasing property so that it could build a new Township building and a new fire station, and the Property was a possible location for both."  Id.  McEwen also states that Brown told him the property "may have soil issues."  Id.  As a result of this conversation with Brown, McEwen's company decided not to bid on the property.  Id.  Brown, on the other hand, does not remember talking with McEwen about the property.  Pl.'s Ex. B at 131:4-5.

Ephraim Stoltzfus was also interested in the property because he wanted to start a farm there.  Pl.'s Ex. H at 34:5-7.  Before the auction, he met with Brown to discuss the prospect of "buying and sharing the ground."  Id. at 44:20-23.  He testified at his deposition that Brown "showed interest" in the property, but he could not remember what Brown said to give him that impression.  Id. at 49:13-25.  Whatever Brown said, Ephraim Stoltzfus came away from the conversation believing that Brown "would buy some on behalf of the township."  Id. at 50:5-9.  Brown, however, testified that he told Ephraim Stoltzfus that the Township was not interested in purchasing the property together with him.  Pl.'s Ex. B at 217:25-218:3.

Ephraim Stoltzfus also testified that he discussed with Levi Stoltzfus of the Honey Brook Fire Company the prospect of jointly purchasing the property.  Pl.'s Ex. H at 50:10-51:19.

4

According to Ephraim Stoltzfus, Levi Stoltzfus was "interested in" acquiring one third of the property.  Id. at 51:13-19.  Levi Stoltzfus admits that he spoke with Ephraim Stoltzfus about the property but maintains that he "told Ephraim that the Honey Book Fire Company was not interested in purchasing the land in conjunction with him."  Dkt. No. 47-5 at 42.

Apart from Ephraim Stoltzfus, the Township and the Fire Company spoke directly with each other about purchasing the property at 3561 Horseshoe Pike together.  Brown testified that after he met with Ephraim Stoltzfus he met with Levi Stoltzfus and discussed the property. Brown came away from his meeting with Levi Stoltzfus with the impression that the Fire Company "didn't have funding in place" to purchase the property or the time to "muster the votes" of Fire Company members in support of making the purchase.  Pl.'s Ex. B at 216:23-217:8.

Defendant Weston Darby, who at the time of the auction was on the Board of Supervisors, testified that two members of the Fire Company approached him to discuss the property.  See Dkt. No. 47-6 at 151:2-152:18.  Brown was also present at the meeting.  Id. at 154:4-5.  Darby did not know the names of the Fire Company representatives.  Id. at 152:13-15. According to Darby, however, "[t]hey raised the possibility of the township joining them on purchasing [the] property wherein they would have owned part of it and we would own part of it."  Id. at 154:13-16.  Darby was interested in acquiring new land for the Township and decided he would inspect the property.  Id. at 167:19-168:5.  After viewing the land, Darby concluded that "it just wasn't that good a piece of ground."  Id. at 168:4.  Darby told Brown the property was "not good for us" and after that "[i]t was a dead issue."  Id. at 169:20-170:9.

Another member of the Board of Supervisors, defendant Donald Johnson, testified that

5

there were "rumors" that the Township and the Fire Company were interested in purchasing the property at 3561 Horseshoe Pike.  Dkt. No. 47-9 at 126:6-8.  Johnson explained, however, that to his knowledge there was no truth to the rumors.  Id. at 126:8-12.  Johnson testified that Brown might have inspected the property on his own but that "he was not authorized . . . by the board to go check into purchasing it."  Id. at 126:22-25.  At one point in his deposition, Johnson denied having any conversations with other members of the Board of Supervisors about the Township and the Fire Company purchasing the property together.  Id. at 126:14-17.  Later, however, he testified that the Board of Supervisors conducted a session in which it "probably" discussed buying the property with the Fire Company.  Id. at 180:4-9.  Johnson explained that "[i]t was not a very good property" and that he "was not interested at all in purchasing the piece of property to begin with, let alone with Honey Brook Fire Company."  Id. at 181:14-18.

Barry Messner, the Chief of the Honey Brook Fire Company, testified that a "future growth committee" of the Fire Company, Dkt. No. 47-12 at 19:14-15, met with Michael Brown to discuss purchasing a property together.  Id. at 27:4-12.  Messner recalled that nothing materialized after the future growth committee's meeting with Brown.  Id. at 32:19-24.

Ultimately, HBE and Ephraim Stoltzfus were the only two bidders at the auction.  Pl.'s Ex. A at 117:1-11.  Despite the averments of Brown and Levi Stoltzfus that they told Ephraim Stoltzfus that they did not want the property, Ephraim Stoltzfus testified that he was "figuring on them buying it" when he participated in the auction.  Pl.'s Ex. H at 72:5.  But there was no written agreement between Ephraim Stoltzfus, the Township and the Fire Company to purchase the property.  Ephraim Stoltzfus admitted at his deposition that he had "no agreement" with the Township or the Fire Company and that if he had won the property at auction, the Township and

6

the Fire Company "could've walked away and [the property] would have been [his]."  Id. at

52:13-18.  He also admitted that "[t]hey weren't obligated to buy [the property]."  Id. at 72:7-8.

        Nonetheless, four days after HBE purchased the property at auction, Ephraim Stoltzfus

contacted Michael Petrelia, the president of HBE, to offer him $1.16 million for the property, or

$75,000 more than what HBE paid for it.  Pl.'s Ex. G.  Petrelia testified at his deposition that he

"didn't take [the offer] very seriously."  Pl.'s Ex. A at 126:1-2.  He expected HBE to make a

profit off the property of more than $75,000.  Id. at 126:4-8.  Additionally, after closing costs,

HBE paid more than $1.2 million for the property; HBE would have lost money had it accepted

Ephraim Stoltzfus's offer.  Id. at 126:17-21.

        Almost three years after the auction, on September 19, 2008, Ephraim Stoltzfus left a

voicemail with Petrelia saying that he "was bidding for" himself, the Township and the Fire

Company at the auction.  Pl.'s Ex. I.  He further stated in the voicemail that if he had won the

property, "we would have shared it."  Id.  At his deposition, however, Ephraim Stoltzfus

explained that his voicemail "might not be like it sounds."  Pl.'s Ex. H at 80:4-5.  Although he

"expected" the Township and the Fire Company to each contribute one third of the purchase

price of the property if he been the high bidder, he testified that "they didn't send [him] on their

bid" and that he "was on [his] own."  Id. at 80:10-11.  He explained that in retrospect it would

have been a "goof" had he won the property because it would have been "hard" for him to repay

a bank loan all by himself.  Id. at 71:3-13.

III.    Township Proceeds with Comprehensive Plan Update and Zoning Changes

        After HBE purchased the property, the Township continued to update its comprehensive

plan.  The Planning Commission met on March 3, 2006 and discussed zoning ordinance

amendments with Theilacker of Brandywine.  See Dkt. No. 47-14 at 41.  Minutes from the meeting note that "[o]ne of the findings in the comprehensive plan is the township has more land zoned for intensive residential uses than is legally required, leading to expanding suburbanization."  Id.  Later that month, on March 22, the Comprehensive Plan Update Task Force voted to approve a final draft of the comprehensive plan update and submit it to the Planning Commission.  Id. at 45.  The minutes also state that Michael Brown said the final draft "will be available for public review at the Township building, the Honey Brook Library and at the Chester County Planning Commission."  Id. at 45-46.  At its April 27 meeting the Planning Commission held a public meeting to receive comments on the comprehensive plan update draft. See id. at 56.  Three people, none of whom were affiliated with HBE, expressed concerns about the plan.  Id. at 56-57.  Despite these concerns the Planning Commission voted to recommend the plan's adoption to the Board of Supervisors.  Id. at 57.

The Board of Supervisors then voted at its May 10 meeting to authorize advertisement of public hearings for the comprehensive plan update to take place the following month.  Id. at 60. Separately on May 10 the Township sent letters to property owners whose parcels were to be affected by Ordinance #119, which contained amendments to the Township's zoning ordinance and zoning map.  See id. at 62.  The letter notified recipients that a public meeting to consider Ordinance #119 was to take place June 14, 2006.  Id.  HBE was among the property owners to receive the letter.  See id.  HBE's letter stated that "[a] portion of [HBE's] property . . . is under consideration for remapping from the Residential District to the Agricultural District."  Id.  The letter explained that the zoning map amendments were "consistent with the new comprehensive plan."  Id.  At that time, however, the updated comprehensive plan had not yet been adopted.

8

The Board of Supervisors did not vote to adopt the plan until December 6, 2006.  Pl.'s Ex. L.

After Petrelia received the Township's May 10 letter he contacted Earl Felty, a land surveyor, explaining that "[t]he situation with the property we purchased in Honey Brook Township has dramatically changed over the last 3 days."  Dkt. No. 47-14 at 65.  Petrelia explained that he "need[ed] to submit a by right plan to Honey Brook Township by the first week in June."  Id.  Specifically, Petrelia requested "a fully engineered preliminary plan for development."  Id.

Around the same time that the Township advertised pending changes to the zoning map, Brown became concerned that the proposed changes "would probably prompt lots of hasty subdivision plans."  Pl.'s Ex. B at 242:6-12.  Accordingly, Brown consulted with Township Solicitor Kristin Camp to determine whether he had the authority to review applications for completeness and reject those that were incomplete.  Id. at 242:13-18.  According to Brown, Camp "basically concluded" that Brown could undertake a completeness review but she advocated a "belt-and-suspenders approach" wherein the Township would also review applications for compliance with the Township's zoning ordinances.  Id. at 242:19-23.  Accordingly, at that time Brown instructed either Township Engineer Reinert or Reinert's supervisor, Jeff Kerlin, that "we needed to make sure [applications] were reviewed for completeness before we got into the review process."  Id. at 247:21-24.  Although Brown could not recall if Reinert or Kerlin was the person with whom he spoke, Reinert recalled at his deposition talking with Brown about conducting a completeness review of land development applications.  Pl.'s Ex. F at 34:8-24.

Reinert and Kerlin then consulted by telephone with the Township's other Solicitor, John

Good, about the completeness review.  Reinert wanted Good's legal opinion because at that time "it wasn't customary to do a review of . . . completeness of an application."  Id. at 39:2-10.  According to Reinert, Good advised that the Township "could review the applications and determine whether or not they were complete or incomplete."  Id. at 40:20-22.  Incomplete applications "were to be rejected and the reasons for the rejection of being incomplete should be noted in a letter and then returned – all materials returned to the applicant."  Id. at 41:3-7.  Reinert explained that Brown was to determine whether an application was complete and Reinert was to identify any missing components of an application.  Id. at 41:23-42:2 and 43:24-44:4.  To Reinert's knowledge, the Township did not notify the public that it was going to review applications for completeness.  Id. at 38:14-16.

Section 405 of the Township's Subdivision and Land Development Ordinance, entitled "Submission of Preliminary Plan," pertains to the Township's authority to review applications for completeness and reject those applications that are incomplete.  Two subsections of Section 405 are especially pertinent.  One subsection states that

> 2. Official submission of a preliminary plan to the Subdivision Officer shall consist of:
>
> > A. Two copies of the application for review of preliminary subdivision or land development plan on the form promulgated for this purpose.
> >
> > B. Copies of the preliminary plan and all supporting plans and information to enable proper distribution and review, as follows:
> >
> > > (1) Two complete plan sets, to include all supporting plans and information.
> > >
> > > (2) One complete plan set without supporting

information accompanied by an Act 247 referral on a form provided by the Chester County Planning Commission.

(3) Thirteen reduced sets (18" x 24") of the title sheet, lot layout sheet, grading sheet, landscaping sheet, and other appropriate sheets as determined by the Subdivision Officer.  Applicants are encouraged to contact the Township in advance to determine the appropriate sheets for submission. [Ord. 150-2010]

(4) Four sewer planning modules (as necessary for on-lot systems) with accompanying plot plan for each module.

C. Payment of application fees and deposit of escrow for plan review cost, as prescribed in the applicable fee schedule.

Honey Brook Twp. Code, Title 22, Section 405.2.

The other pertinent subsection states that

3. Copies of the preliminary plan and all required supplemental data initially shall be submitted to the Subdivision Officer, together with the required fees and escrow deposit established in accordance with the terms of this Chapter, a minimum of 12 business days prior to the public meeting at which the plan will be presented.  The Subdivision Officer shall note the date of receipt of the application, fees, and escrow deposit. [Ord. 150-2010]

A. The application shall not be deemed to be submitted until a complete application and the required fees and the required escrow deposit all have been submitted.

B. The Subdivision Officer shall make a preliminary review of the application.  If the Subdivision Officer determines that the application is defective on its face, he shall notify the applicant, and the application is deemed not accepted. The applicant may request the return of all submissions for the purpose of correction and resubmission.

Id. at Section 405.3 (emphasis added).  Although Section 405 vests the "Subdivision Officer"

11

with the authority to undertake a "preliminary review" of an application, the Township did not

have a Subdivision Officer when HBE first applied to develop its property in the summer of

2006.  The Township first appointed a Subdivision Officer on January 2, 2007.  Pl.'s Ex. R.

Two individual defendants who were members of the Planning Commission at the time

when HBE sought to develop its property testified that the Planning Commission typically did

not recommend the rejection of applications that were incomplete.  Instead, the Planning

Commission generally gave applicants the opportunity to submit additional materials to complete

their applications.  See Pl.'s Ex. DD at 66:12-20 (Joann Guiseppe dep.) and Pl.'s Ex. EE at 76:8-

11 (Raymond Henderson dep.).

Moreover, defendant Greg Cary, who was a member of the Board of Supervisors while

HBE was applying to develop the property, testified that he did not expect the zoning

amendments to cause an increase in land development applications.  Pl.'s Ex. GG at 245:22-

246:5.  Cary further testified that he did not know if Brown or Reinert implemented a new review

policy but he expressed his opinion that Brown would not have had the authority to implement a

new review procedure without first consulting with the Board of Supervisors.  Id. at 247:15-

248:3.  Cary could not recall if the Board of Supervisors ever appointed a Subdivision Officer,

but he opined that it would have been "inappropriate" for a Township official to act as a

Subdivision Officer without having been appointed by the Board.  Id. at 237:8-240:8.

IV.	HBE Unsuccessfully Attempts to Develop Its Property

A.	First Application

HBE submitted its first subdivision and land development application on June 13, 2006,

one day before the public meeting on Ordinance #119.  Pl.'s Ex. O.  HBE's proposal called for

12

the subdivision of its property into three lots.  The first two lots were to contain the property's existing dwellings.  Id. at HBE_00450.  The third lot was to contain thirteen new six-unit townhouses.  Id. at HBE_00451.  Mark Magrecki, a landscape architect who HBE retained to prepare its application, admitted at his deposition that the application was submitted "with the intention of getting it in before the zoning map was amended."  Pl.'s Ex. JJ at 167:9-12.  In a letter dated June 20 Reinert informed HBE that "[i]n accordance with Section 405.C[2] & 502 of the Township Subdivision and Land Development Ordinance, we have determined that the submission is incomplete and will not be forwarded to the Honey Brook Township Planning Commission until a complete submission is received."  Pl.'s Ex. P at 1.  The letter also listed five deficiencies that made the application incomplete.  See id.

  B.  Second Application

  On June 30, HBE submitted a second application that attempted to address the deficiencies that Reinert identified in his June 20 rejection letter.  See Pl.'s Ex. S.  Like HBE's first application, the second application proposed the subdivision of its property into three lots, the third of which was to contain new residential townhouses.  Id. at HBE_00476.  On July 5, while that application was pending, the Board of Supervisors voted to adopt Ordinance #119.  Pl.'s Ex. PP.  The Ordinance changed the zoning of HBE's property from residential to agricultural.  See Pl.'s Ex. F at 119:5-15.  Because HBE submitted its application before Ordinance #119 was adopted, however, the Township's old zoning map governed the application.

---

   [2]  Section 405.C of the Township's Subdivision and Land Development Ordinance does not exist in the current version of the Ordinance.  The parties agree that Section 405 applies to the present matter.

Nonetheless, in a letter dated July 10, 2006, Brown notified HBE that its second application was being rejected because it was incomplete pursuant to Sections 405 and 502 of the Township Subdivision and Land Development Ordinance.  Pl.'s Ex. U.  The letter identified three deficiencies that rendered the application incomplete.  Id.  Brown wrote that the application was "rejected" and would not "enter[] the review cycle" because of these deficiencies.  Id. at 1.  In response to Brown's rejection letter, counsel for HBE sent Township Solicitor Good a letter dated July 14 arguing that the Township's rejection of HBE's two applications was "improper" because HBE's applications were being held to standards that did not apply to previous applicants.  See Dkt. No. 47-23 at 32.  The letter further requested that the Township reconsider its decision and threatened litigation in the Court of Common Pleas of Chester County.  Id.

On July 18, 2006, Good wrote a letter to Brown expressing concern that the Township "has been far less technical in its objections to completeness of plans in the past versus the position that we are taking with these recent sets of plans which obviously have been filed in order to beat the deadline."  Pl.'s Ex. FF at 1-2.  Good also warned that "the court will not look kindly if we reject summarily an application for reason X when we have historically not rejected applications for the same or similar deficiencies in the past."  Id. at 2.

The Board of Supervisors subsequently directed the Planning Commission to review HBE's second application.  See Pl.'s Ex. HH at 000138.  Reinert sent a letter dated August 18 to the Planning Commission explaining that the second application would be reviewed "[o]ut of an abundance of caution . . . for its compliance with the applicable ordinances of the Township in effect at the time of filing."  Id.  Reinert further explained that his review letter "does not invalidate the earlier finding that the application was substantially incomplete and should be

14

rejected on its face." Id.  Reinert's letter went on to list dozens ways the application did not

comply with the Township's ordinances.  See generally Pl.'s Ex. HH.

Minutes from the Planning Commission's August 24 meeting reflect that the Commission

considered HBE's application but that "[n]o one was present to represent the applicant."  Pl.'s

Ex. II at 1.  The record contains no evidence that HBE received notice that the Planning

Commission was going to consider its application at that meeting.  The Planning Commission

determined that the application was "substantially incomplete and [it was] rejected for that

reason."  Id.  Due to concerns that a court might take issue with the completeness review,

however, the Planning Commission also reviewed the application for its compliance with

Township ordinances and concluded that "the level of non-compliance was sufficiently egregious

to dismiss the plans outright."  Id.  The Planning Commission voted to recommend that the

Board of Supervisors reject the application as noncompliant with the Township's ordinances.  Id.

at 1-2.

HBE did not know that the Planning Commission had reviewed its second application

and on August 30 Magrecki sent Reinert three letters attempting to supplement the application.

See Pl.'s Ex. KK.  Brown responded in a September 7 letter to HBE's counsel explaining that the

Township had already deemed the application "grossly non-compliant with ordinance

requirements."  Pl.'s Ex. LL.  Brown also refused to accept HBE's supplemental materials,

stating that "[t]he Township rejected the application submitted in June,[3] and it isn't accepting

additional material on an application already rejected."  Id.  Brown also notified HBE's counsel

---

[3]        HBE submitted two applications in June, one on June 13 and the other on June 30.
Brown appears to refer to both applications collectively as one application.

that the Board of Supervisors was going to review the Planning Commission's recommendation to disapprove HBE's application on September 13.  Id.  Despite Brown's notice to HBE's counsel that the Board of Supervisors would consider its application on September 13, no representative of HBE attended the Board's meeting that day.  Pl.'s Ex. MM at 2.  The Board voted to disapprove HBE's application on the ground that it did not comply with the Township's zoning ordinances.  Id.  The Township sent HBE a letter explaining the Board of Supervisors' decision the following day.  Dkt. No. 47-24 at 25-35.  HBE then filed a land use appeal in the Court of Common Pleas of Chester County.  See Pl.'s Ex. NN.  That case is still pending.  Pl.'s Ex. OO.

C.     Third Application

While HBE's appeal was pending in the Court of Common Pleas, the Honey Brook Zoning Hearing Board heard a challenge to Ordinance #119 that was brought by two property owners who are not parties to this suit.  Pl.'s Ex. RR.  On February 9, 2007, the Zoning Hearing Board invalidated the Ordinance.  Id.  The Township promptly appealed this decision to the Court of Common Pleas of Chester County.  See Pl.'s Ex. SS.  According to Reinert, "[t]he Township expect[ed] that the Court of Common Pleas [would] reverse the Zoning Hearing Board's Decision."  Pl.'s Ex. AAA (May 20, 2008 letter from Reinert to Planning Commission).

As a result of the Zoning Hearing Board's decision, however, HBE's property was once again zoned for residential use.  Accordingly, HBE submitted a third application to develop its property on March 14, 2007.  See Pl.'s Ex. TT.  This application, like the previous two, sought to build new residential buildings on an undeveloped portion of the property.  Id. at HBE_00355.  HBE simultaneously submitted a separate application to subdivide the property into three lots,

16

the third of which was to contain the new residences.  See Pl.'s Ex. UU.[4]  On March 12, 2008,

the Planning Commission voted to approve HBE's plan to subdivide its property.  Pl.'s Ex. VV

at HBE_00307.  The Planning Commission also granted HBE certain waivers from the

Township's Subdivision and Land Development Ordinance.  Id.

The Planning Commission did not, however, vote on whether to approve HBE's plan to

develop the property for residential use, even though nearly a year had passed since HBE

submitted its third land development application.  The Township's Subdivision and Land

Development Ordinance provides that

> [a]ll applications for preliminary approval of a plan shall be acted
> upon by the Board of Supervisors and communicated to the
> applicant within 90 days following the date of the regular meeting
> of the Planning Commission next following the date the
> application is filed; provided, that should the said next regular
> meeting of the Planning Commission occur more than 30 days
> following the filing of the application, the said 90-day period shall
> be measured from the thirtieth day following the day the
> application is filed.

Honey Brook Twp. Code, Title 22, Section 406.2.C.  Here, the Board of Supervisors did not vote

on HBE's third land development application until December 10, 2008, well after the time period

mandated by the Subdivision and Land Development Ordinance.  See Pl.'s Ex. JJJ.

The reasons for this delay are unclear.  On May 20, 2008, Reinert wrote a letter to the

Planning Commission stating that "[p]ursuant to the Applicant's consent, the Township's review

period for the lot #3 land development started upon grant of final approval of the 3 lot

---

[4]      Plaintiff's Exhibit UU appears to be missing a page and it is not apparent from the
document that HBE actually requested permission to subdivide its property.  Nevertheless, the
parties do not dispute this issue and the record does reflect that the Planning Commission
subsequently approved HBE's subdivision plan.

subdivision."  Pl.'s Ex. AAA at HBE_00309.  Defendants, however, do not point to any evidence in the record showing HBE's consent to this delay.  HBE asserts that the Township "unilaterally" decided to postpone consideration of HBE's third land development application.  Dkt. No. 48 at 32.

After the Planning Commission approved HBE's subdivision plan on March 12, its next meeting took place on March 27.  See Pl.'s Ex. XX.  The Planning Commission did not review HBE's third land development application at that time.  At its next meeting, on April 24, the Planning Commission voted to recommend that the Board of Supervisors deny the application.  Pl.'s Ex. YY at 2.  HBE did not receive notice that the Planning Commission would be considering its application at the April 24 meeting.  See Pl.'s Ex. WW (draft email from Brown to HBE's counsel stating "unfortunately I didn't notify you the LD plan was on the PC agenda for consideration").  The minutes from that meeting do not explain the reasons for the Planning Commission's vote.  See   Pl.'s Ex. YY at 2.

It also appears as if the Planning Commission did not have the benefit of Reinert's analysis when it voted on April 24, for on May 20 Reinert submitted to the Planning Commission a review letter noting several ways the third land development application did not comply with the Township's ordinances.  See Pl.'s Ex. AAA.  Two individual defendants who were members of the Planning Commission at the time testified that the Planning Commission typically relied heavily on the input of the Township Engineer.  See Pl.'s Exs. CCC at 77:21-78:11 (deposition testimony of Michael France) and DDD at 67:8-18 (deposition testimony of Stacie Popp-Young).

The day after Reinert submitted his review letter to the Planning Commission, Brown emailed the members of the Planning Commission stating that HBE's "application will be on

your agenda again." Pl.'s Ex. BBB.  Brown explained in his email that HBE's third land

development application was under reconsideration because the Planning Commission had to

provide specific reasons for denying the application and because HBE did not receive notice that

the Planning Commission was considering its application on April 24.  Id.  Brown further stated

that the purpose of his email was "to arm you with information so you may weigh arguments that

the applicant is likely to present."  Id.  Brown proceeded to express his view that "[t]here are

several major defects in the HBE plan" and he advised the Planning Commission that "[t]he law

does not say you have to let an applicant revise a plan with major defects."  Id.

On May 22, the day after Brown's email, the Planning Commission met and reconsidered

HBE's third land development application.  See Pl.'s Ex. EEE at 1-2.  Petrelia and HBE counsel

were present.  Id. at 1.  The Planning Commission voted to recommend that the application be

denied for the reasons stated in Reinert's May 20 review letter.  Id. at 2.  Petrelia expressed his

opinion that "the Township had acted in bad faith, and the Planning Commission, Board and

Township officials were open to a civil liability suit."  Id.

On June 11, counsel for HBE wrote Brown "requesting an extension of 60 days in order

to obtain clarification from the Township Engineer to the various ambiguities in his review letter

transmitted on May 20, 2008."  Pl.'s Ex. FFF at 1.  The record does not show whether that

request was granted.  On August 7, before the Board of Supervisors voted on HBE's land

development application, the Chester County Court of Common Pleas issued an order reversing

the Zoning Hearing Board's decision to invalidate Ordinance #119.  Pl.'s Ex. GGG.  As a result,

HBE's property was once again zoned for agricultural use.

Accordingly, on August 19 Reinert sent another letter report to the Planning Commission

19

stating that HBE's property was again zoned for agricultural use and that "[m]ultiple family dwelling developments are not permitted by right, by special exception or by conditional use in the Agricultural zoning district."  Pl.'s Ex. HHH at 000230.  At its next meeting on August 28 the Planning Commission voted to deny HBE's application "based on lack of zoning entitlement."  Pl.'s Ex. III at 000209.  The Board of Supervisors later voted to deny the application "based on non-compliance with all ordinance provisions."  Pl.'s Ex. JJJ at 000213. On the advice of counsel HBE did not appeal the Board's decision to deny its third application. Dkt. No. 47-14 at 52:19-53:9.

V.      Township's Treatment of Other Incomplete Land Development Applications

        The Township did not reject land development applications for being incomplete until it started advertising Ordinance #119 in June 2006.  See Pl.'s Ex. B at 241:23-242:23.  HBE points to two instances where the Township allowed an application to proceed even though it lacked important components.  One involves Whitehorse Glen, who submitted a land development application on March 3, 2005.  Pl.'s Ex. X.  Reinert prepared a review latter for the Planning Commission that listed an array of documents that were missing from the application.  See id., Reinert's March 23, 2005 review letter.  The Board of Supervisors conditionally approved Whitehorse Glen's application even though the applicant had not yet addressed all the deficiencies Reinert identified in his review letter.  Pl.'s Ex. AA at 2.  The Board later granted a second conditional approval even though some items remained outstanding.  Pl.'s Ex. BB at 2-3.

        The other incomplete application that the Township accepted was from Welsh Mills, who on November 6, 2003 submitted a land development application.  Pl.'s Ex. Y.  Reinert's review letter for that application identified several documents that Welsh Mills had not yet submitted.

20

See id., Reinert's November 20, 2003 review letter.  At no point was the application rejected for being incomplete.

The Township, on the other hand, points to three other applications that were also rejected because they were incomplete.  On July 6, 2006, the Township rejected development applications entitled "Hammell Tract I Subdivision" and "Hammell Tract II Subdivision."  See Dkt. Nos. 47-28 at 44 (Tract I) 47-29 at 11.  In both rejection letters, the Township explained that "the submission is incomplete and is rejected as such from entering the review cycle."  Id.  With respect to both applications, Reinert sent the Planning Commission a letter explaining that the Board of Supervisors "[o]ut of an abundance of caution . . . directed a review of the purported application for its compliance with the applicable ordinances of the Township at the time of filing."  Id. at Dkt. Nos. 47-28 at 45 (Tract I) and 47-29 at 12 (Tract II).  Reinert later sent the Planning Commission a letter using identical language with respect to HBE's second application.  See Pl.'s Ex. HH.  The third application noted by the Township, submitted by Elliott Land Company, went before the Planning Commission, which recommended the application be rejected because it lacked transferable development rights.  Dkt. No. 47-28 at 10-11.  The Board of Supervisors cited the absence of "a proof of purchase and transfer of any development rights to support the density shown" as a reason for rejecting the Elliott application.  Dkt. No. 47-28 at 26.  Reinert raised this same issue to the Planning Commission with respect to HBE's third application.  Dkt. No. 47-24 at 5.

The Hammell and Elliott property owners both challenged the Township's rejections of their applications in the Chester County Court of Common Pleas.  The Hammell property owners moved for the Court to direct the Township "to immediately accept, process, and review the two

21

applications for subdivision" on the ground that the Township's completeness review was improper under the Subdivision and Land Development Ordinance.  Dkt. No. 47-28 at 2. Notably, the Hammells argued that Section 405 of the Subdivision and Land Development Ordinance limits the scope of the completeness review to "the five page form entitled 'application,'" but not the application's supporting documents.  Id. at 3.[5]  The Court of Common Pleas, however, denied the Hammells' motion on the ground that the plaintiffs had "failed to demonstrate a clear right to relief."  Id. at 4.  The Court specifically concluded that "the Subdivision Officer's preliminary review includes the application form and the materials filed in support of that application.  In other words, the Subdivision Officer is to review not just the application form, but all of the materials that constitute an 'official submission.'"  Id. at 3, quoting Honey Brook Twp. Code, Title 22, Section 405.2.  The Court of Common Pleas did not, however, address whether Brown or Reinert had the authority to conduct a completeness review even though neither man was the Township's Subdivision Officer.

The Court of Common Pleas also affirmed the rejection of the Elliott Land Company's application.  Id. at 6-7.  The Court acknowledged that some of the Board of Supervisors' reasons for rejecting the Elliott application were readily correctable, but nonetheless found that several of the Board's proffered reasons for rejecting the application were "clearly substantive and valid reasons for denying Elliott's application."  Id. at 7.

## STANDARD OF REVIEW

Summary judgment will be granted "against a party who fails to make a showing

---

[5]     HBE now challenges the Township's completeness review partly on identical grounds.  See Dkt. No. 48 at 19.

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23.  If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. A fact is "material" if it might affect the outcome of the case under governing law.  Id.

> To establish "that a fact cannot be or is genuinely disputed," a party must:

> > (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> > (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the movant.  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

23

**DISCUSSION**

I.      Substantive Due Process

Defendants move for summary judgment with respect to HBE's substantive due process claim.  To make out a substantive due process claim, HBE must as a threshold matter establish that it has a protected property interest.  HBE's ownership interest in its property easily clears this hurdle.  See DeBlasio v. Zoning Bd. of Adjustment for Twp. of W. Amwell, 53 F.3d 592, 601 (3d Cir. 1995) (abrogated on other grounds by United Artists Theatre Circuit v. Twp. of Warrington, 316 F.3d 392 (3d Cir. 2003)) (noting that "one would be hard-pressed to find a property interest more worthy of substantive due process protection than ownership").

The more difficult question is whether the defendants' conduct actually violated HBE's right to substantive due process.  "The touchstone of due process is protection of the individual against arbitrary action of government."  Wolff v. McDonnell, 418 U.S. 539, 558 (1974).  The Supreme Court has "repeatedly emphasized that only the most egregious official conduct can be said to be arbitrary in the constitutional sense."  Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998) (internal quotation marks omitted).  Official conduct is sufficiently egregious when it shocks the conscience.  See id. at 846-47.  Determining what shocks the conscience is not a "precise" endeavor, Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 285 (3d Cir. 2004), and conduct that rises to the level of conscience-shocking "varies depending on the context."  United Artists, 316 F.3d at 399 n.5.  "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  Lewis, 523 U.S. at 849.

In the context of land use disputes, the Court of Appeals has cautioned that

24

> every appeal by a disappointed developer from an adverse ruling of the local planning board involves some claim of abuse of legal authority, but "[i]t is not enough simply to give these state law claims constitutional labels such as 'due process' or 'equal protection' in order to raise a substantial federal question under section 1983."

United Artists, 316 F.3d at 402, quoting Creative Env'ts, Inc. v. Estabrook, 680 F.2d 822, 833 (1st Cir. 1982).  Municipal conduct that reflects an "improper motive," without more, does not shock the conscience.  Id. at 400.  The United Artists Court also approvingly cited to opinions from other circuits giving examples of other official conduct that does not rise to the level of conscience-shocking.  For example, the Court agreed with the observation of the Court of Appeals for the Eighth Circuit that a municipality's knowing, bad-faith enforcement of an invalid zoning law does support a substantive due process claim.  Id., citing Chesterfield Dev. Corp. v. City of Chesterfield, 963 F.2d 1102, 1104-05 (8th Cir. 1992).  See also Highway Materials, Inc. v. Whitemarsh Twp., 386 Fed. App'x 251, 257 (3d Cir. 2010) (noting that "a bad-faith violation of state law . . . does not meet the [conscience-shocking] standard").  Similarly, the United Artists Court agreed with the Court of Appeals for the First Circuit's conclusion that a plaintiff's allegation that the Puerto Rico Regulations and Permits Authority "'engaged in delaying tactics'" and acted "'based on considerations outside the scope of its jurisdiction'" does not shock the conscience.  United Artists, 316 F.3d at 402, quoting PFZ Props., Inc. v. Rodriguez, 928 F.2d 28, 32 (1st Cir. 1991).  The demanding "shocks the conscience" standard set forth in United Artists "prevents [federal courts] from being cast in the role of a zoning board of appeals."  Id. (internal quotation marks omitted).

The Court of Appeals has also given examples of conduct that can shock the conscience.

For instance, evidence of "corruption or self-dealing" might shock the conscience.  Eichenlaub, 385 F.3d at 286.  A municipality's land use decision that is motivated by "hostility to constitutionally-protected activity on the premises" might also be sufficiently egregious to support a substantive due process claim.  Id. at 285.  A municipal action that reflects "bias against an ethnic group" can shock the conscience.  Id. at 286.  A "virtual taking" might also clear the conscience-shocking hurdle.  Id.  While this list of examples is not necessarily exhaustive, it does elucidate the type of official conduct that is egregious enough to violate substantive due process rights.

The conduct here does not shock the conscience.  Three of the four types of official action described in Eichenlaub plainly do not apply.  HBE does not argue that defendants' conduct resulted in a virtual taking.  There are no allegations that the Township acted out of prejudice toward an ethnic group or hostility to any constitutionally protected activity that was to take place on HBE's property.

HBE attempts to fit defendants' conduct into the fourth type of conscience-shocking behavior identified in Eichenlaub by applying the label "corrupt self-dealing" to defendants' conduct as a whole.  Dkt. No. 48 at 46.  But the evidence does not support HBE's assertion.  "Self-dealing" is "[p]articipation in a transaction that benefits oneself instead of another who is owed a fiduciary duty."  Black's Law Dictionary (9th ed. 2009).  The Eichenlaub Court identified Conroe Creosoting Co. v. Montgomery County, 249, F.3d 337 (5th Cir. 2001) as an example of a case that presented a "whiff of self-dealing."  Eichenlaub, 385 F.3d at 285.  There, local officials allegedly forced the unlawful sale of the plaintiff's property at auction and the principal defendant's brother was hired to perform auction services.  Id.  This "whiff of self-dealing"

supported the plaintiff's substantive due process claim.  Id.

More recently, the Court of Appeals decided a case in which property owners whose land development applications were denied presented evidence that one of the members of the relevant Board of Supervisors had previously attempted to purchase the underlying property. Locust Valley Golf Club, Inc. v. Upper Saucon Twp., 391 Fed. App'x 195, 199 (3d Cir. 2010). The plaintiffs argued that this evidence "support[ed] a reasonable inference that [the Supervisor] may have acted out of spite or in the remote hope that he might one day purchase the property himself."  Id.  The Court of Appeals, however, rejected the plaintiffs' argument that this evidence showed self-dealing that shocked the conscience.  Instead, the evidence at most showed that the Supervisor acted with an "improper motive" that was not sufficiently egregious to make out a substantive due process claim.  Id.  The Court therefore affirmed the district court's grant of summary judgment in favor of the defendants.  Id. at 200.

Here, HBE's evidence of self-dealing is even weaker.  There is no evidence that any individual defendant sought to benefit personally by preventing HBE from developing the property.  There is no evidence that the Township was in a position to profit from denying HBE's land development applications.  The record does contain some evidence that the Township expressed interest in the property before the auction took place.  See Pl.'s Exs. J (declaration of Gary McEwen) and H at 49:13-25 (deposition of Ephraim Stoltzfus).  HBE argues that this evidence supports the inference that HBE's acquisition of the property "vexed" the Township and caused it to act out of spite.  Dkt. No. 48 at 14.  At most, however, this evidence supports the conclusion that the Township denied HBE's land development applications due to an improper motive like in Locust Valley Golf Club.  Such an improper motive, even if proven, does not

27

shock the conscience.

HBE takes issue with the Township's completeness review procedure and argues that whether this procedure was "proper[] is a hotly contested issue in this case." Dkt. No. 61 at 6 (emphasis added). But the Court of Appeals has cautioned that "the term 'improper' sweeps much more broadly" than the shocks-the-conscience standard. United Artists, 316 F.3d at 400. "Improper" conduct does not necessarily shock the conscience. Even if the Township's completeness review was improper, it does not shock the conscience. The record reflects that the Township initiated this procedure only after seeking the legal counsel of its Solicitors. The Solicitors approved the completeness review. See Pl.'s Ex. B at 242:19-23 and Pl.'s Ex. F at 40:19-41:7. Even if HBE is correct that Brown and Reinert were not authorized to conduct completeness reviews because neither man was the Township's "Subdivision Officer," as that term is used in Section 405 of the Township's Subdivision and Land Development Ordinance, Brown and Reinert were entitled to rely on the advice of the Township's attorneys. Their decision to undertake completeness reviews does not shock the conscience.

After Solicitor Good later expressed concerns over the completeness review procedure, the Township reviewed HBE's second and third applications for its compliance with the Township's zoning ordinances and found several substantive problems with both applications. See generally Pl.'s Exs. HH and AAA. HBE does not argue that its applications actually complied with the ordinances but instead notes that it did not receive notice from the Township that the Planning Commission was going to review its applications.[6] HBE also protests that it

_____

[6]     HBE also asserts that it did not receive notice that the Board of Supervisors was going to review its second application but the first sentence of Brown's September 7, 2006 letter to HBE's counsel states that "[t]his letter's primary purpose is to inform you the Board of

28

was not allowed to submit additional supplemental materials before the Board of Supervisors reviewed its second application.  At worst, the Township's conduct here amounts to a bad-faith violation of state law that does not shock the conscience.  See United Artists, 316 F.3d at 400 and Highway Materials, 386 Fed. App'x at 257.

HBE also takes issue with the extent of the Township's completeness review, arguing that Section 405 of the Subdivision and Land Development Ordinance permits the Township to review only the application form and fees for completeness and not the supporting documents. The Court of Common Pleas of Chester County, however, rejected a similar argument in the Hammell case.  The Court explained that under Section 405 "the Subdivision Officer's preliminary review includes the application form and the materials filed in support of that application."  Dkt. No. 47-28 at 3.  Therefore, the Township's decision to review HBE's supplemental materials for completeness does not shock the conscience.

Similarly, the Township's delayed decision with respect to HBE's third development application does not shock the conscience.  The Township might have "'engaged in delaying tactics'" with respect to this application, but such conduct does not establish a violation of HBE's substantive due process rights.  United Artists, 316 F.3d at 402, quoting PFZ Props., 928 F.2d at 28.

The cases on which HBE relies do not compel a different result.  In one case, Lonzetta Trucking & Excavating Co. v. Schan, 144 Fed. App'x 206 (3d Cir. 2005), the Court of Appeals affirmed the district court's denial of summary judgment on the plaintiff's substantive due

---

Supervisors will review the Planning Commission's recommendation to disapprove this plan at its September 13 meeting starting at 4:00 pm."  Pl.'s Ex. LL.  Despite this notice, no representative of HBE appeared at the Board's September 13 meeting.  Pl.'s Ex. MM at 2.

process claim because there was a genuine issue as to whether the defendants acted arbitrarily in ordering the plaintiff's quarry closed even though the plaintiff had obtained a mining permit from the state.  Id. at 212.  As another court in the Third Circuit has noted, Lonzetta's "discussion of the facts is scant and therefore it is difficult to draw any lessons from the Third Circuit's statement that there were disputed factual issues precluding summary judgment."  Cherry Hill Towers, L.L.C. v. Twp. of Cherry Hill, 407 F. Supp. 2d 648, 657 (D.N.J. 2006).  One difference between Lonzetta and the present dispute, however, is apparent.  In Lonzetta, the landowner successfully challenged the municipality's action in the Court of Common Pleas.  Lonzetta, 144 Fed. App'x at 208.  The Commonwealth Court affirmed the Court of Common Pleas, concluding that the landowner had the right to operate its quarry.  Id.  Here, by contrast, no court has deemed the Township's conduct improper.  In fact, other similarly situated landowners have challenged the Township's denial of their development applications in the Court of Common Pleas and lost. See Dkt. No. 47-28 at 2-7.

The other case on which HBE relies is Hankin Family Partnership v. Upper Merion Township, No. 01-1622, 2012 WL 43610 (E.D. Pa. Jan. 6, 2012).  The plaintiffs in that case brought a substantive due process claim arising out of the municipality's decision to zone its property for agricultural use.  Id. at *1.  In denying the defendants' motion for summary judgment the Court noted that some members of the Board of Supervisors sought to develop nearby properties and might have been motivated by a desire to limit competition from the plaintiffs.  Id. at *20-21.  Additionally, the Pennsylvania Supreme Court deemed the defendants' zoning decision "an arbitrary exercise of police power."  Id. at *18.  Here, it bears repeating, there is no evidence that any individual defendant stood to profit from preventing HBE from

developing its property and no court in Pennsylvania has deemed the Township's conduct toward

HBE improper.  Accordingly, I will grant defendants' motion for summary judgment with respect

to HBE's substantive due process claim.

## II.      Equal Protection

HBE also moves for summary judgment with respect to HBE's equal protection claim.  A

"class of one" plaintiff has a successful equal protection claim where he "has been intentionally

treated differently from others similarly situated and . . . there is no rational basis for the

difference in treatment."  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per

curiam).  The Court of appeals "do[es] not view an equal protection claim as a device to dilute

the stringent requirements needed to show a substantive due process violation."  Eichenlaub, 385

F.3d at 287.  Furthermore, "[i]t may be very unlikely that a claim that fails the substantive due

process test will survive under an equal protection approach."  Id.

If there exists a case where a substantive due process claim fails but an equal protection

claim survives, this is not it.  Defendants have pointed to two other property owners, Hammell

and Elliott, whose development applications were also subjected to completeness reviews and

denied.  HBE attempts to distinguish the Hammell and Elliott development plans by noting that

those residential communities would have created population densities that were too dissimilar to

HBE's.  Dkt. No. 61 at 10.  I fail to see how population density is a meaningful characteristic for

the purpose of the equal protection analysis.  HBE does not dispute that the Hammell and Elliott

plans were rejected for the same reasons HBE's plans were rejected.  HBE's equal protection

claim therefore fails because plaintiff and other landowners were treated similarly.

III.    Civil Conspiracy

Finally, I will decline to exercise supplemental jurisdiction over HBE's state-law civil conspiracy claim.  A district court may decline to exercise supplemental jurisdiction where it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367 (c)(3).  The Court of Appeals instructs that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court <u>must</u> decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."  <u>Borough of W. Mifflin v. Lancaster</u>, 45 F.3d 780, 788 (3d Cir. 1995) (emphasis added).  The parties do not argue that considerations of judicial economy, convenience or fairness give me a justification for retaining jurisdiction over HBE's state-law conspiracy claim.  I will therefore dismiss this claim without prejudice.

An appropriate Order follows.

32